HALL, Judge.
Vernon Vickers appeals a final summary judgment entered in favor of Carl Shepard. We reverse.
The undisputed facts leading up to the present posture of this case are as follows: On three occasions in 1981, Vickers purchased cattle from Shepard by means of three loans from the First National Bank of Florida. In conjunction with each of the loans, appraisals were prepared by Dave Ballard without the benefit of a physical inspection of the cattle. The three loans were subsequently consolidated. Vickers eventually defaulted on the loan and turned over the cattle to First National. After it sold the cattle, First National filed a complaint against Vickers for a deficiency judgment. Vickers filed a counterclaim against First National and Shepard in which he alleged that he was induced by First National, through its executive vice president Roy Jackson and/or Shepard, to enter into a series of transactions for the purchase of cattle by means of fraud, deception, and misrepresentation. Shepard *1017 filed a motion for summary judgment alleging that there was no genuine issue of material fact. At the conclusion of the hearing on Shepard’s motion, the trial court granted the motion stating that there was nothing in the record to suggest that Shepard conspired to produce, or actively participated in producing, false appraisals of the cattle knowing that Vickers would rely on them. Nor, stated the court, was there anything in the record to show that Vickers actually relied on the appraisals in obtaining the loan.
We hold, that the evidence regarding whether Shepard participated in procuring the false appraisals and whether Vickers relied on those appraisals is conflicting and, therefore, the entry of summary judgment in favor of Shepard was improper.
The conflicting evidence is revealed in the deposition testimony of Vickers, Jackson, Shepard, and Ballard.
Vickers testified at his deposition that while having coffee with Shepard at Shepard’s business one morning Shepard stated that he needed to get rid of some of his cattle and he could make Vickers a good deal on them. During the conversation, Jackson called Shepard. After Shepard spoke to Jackson, he put Vickers on the phone. Jackson told Vickers that Shepard had said that Vickers might like to buy some cows and that First National would loan him the money to do so. Jackson said he would have to get an appraisal and he would then get back in touch with Vickers. Within the next hour and a half Jackson called back and asked Vickers if he would like to come by the bank and sign a promissory note. Vickers went to the bank and signed the note. He did not see the cattle before he signed the note. During the transaction, Jackson told Vickers he was getting a good deal and quoted a value per head of cattle of $800 or more from what Vickers assumed was an appraisal. When asked if he ever saw an appraisal, Vickers stated that if he had he did not realize that it was an appraisal. Vickers purchased the cattle from Shepard on two other occasions. On both of those occasions, Shepard approached Vickers offering to sell him cattle and Vickers asked Jackson if he could obtain a loan from First National. When Vickers would go to Jackson’s office to sign the necessary papers, Jackson would read from what Vickers assumed was an appraisal and comment that .Vickers was getting a good deal. Vickers did see at least some of the cattle before he purchased them on the second and third occasions.
Jackson testified at his deposition that Vickers called him seeking a loan to purchase cattle from Shepard. Jackson informed both Vickers and Shepard that an appraisal would have to be prepared. Vick-ers and Shepard asked Jackson if Ballard would be an acceptable appraiser, and Jackson responded affirmatively. Jackson never had any contact with Ballard. The appraisals, along with other necessary information, were sent to Jackson. When Vick-ers came to Jackson’s office to execute the loan documents, he read all of the documents and voiced no concerns or objections.
Shepard testified at his deposition that Vickers approached him seeking to purchase some cattle. Vickers indicated to Shepard that he could obtain financing for the purchase from First National, and Shepard quoted him a price of $628 for each cow and $1000 for each bull. The two negotiated the sale of all of the cattle that Vickers ultimately bought from Shepard at one time, but the purchase of the cattle took place over the course of three transactions. Shepard further testified that Jackson called him and gave him some figures and asked him to have Ballard use them to prepare an appraisal on the cattle so that Jackson would have something for his files for the examiners. Shepard knew the appraisal Ballard subsequently prepared was not an actual physical appraisal because Ballard did not have enough time to go out and inspect the cattle. Shepard also knew that the appraisal was for more than what Vickers was paying him for the cattle. Shepard did not tell Jackson about this disparity because he thought Vickers was purchasing cattle from someone else and that the appraisal also covered that other transaction. Shepard was independently *1018 aware only of this first appraisal. Ballard told him about the two other appraisals Ballard subsequently prepared.
Ballard testified at his deposition that he agreed to prepare the first appraisal after Shepard told him that Jackson wanted him to write up an appraisal and would pay him $50 for doing so. Shepard gave Ballard figures furnished by Jackson to be used in preparing the appraisal. Ballard gave the appraisal to someone in Shepard’s office who delivered it to Jackson. Jackson later told Ballard that he would need two more appraisals prepared. Ballard was again contacted by Shepard and given figures Shepard said were furnished by Jackson. Although these last two appraisals had the name of First National on them and were addressed to Jackson, Shepard told Ballard not to bill the bank for them because they were for Shepard. Shepard said he would pay Ballard, but Ballard was not sure if he was ever paid.
Ballard never physically inspected the cattle that were the subjects of the three appraisals. When asked if he ever had any reason to believe that the bank did not rely on the appraisals, Ballard stated that he thought Jackson was using them to make his records look good because the figures represented the cattle to be worth almost twice what the market reflected.
As can be seen from the above synopses of the relevant deposition testimony, Shepard, as the movant for a summary judgment, has not shown conclusively the absence of a genuine issue of material fact. See Holl v. Talcott, 191 So.2d 40 (Fla.1966). The testimony revealed that there is a question of fact as to whether Jackson furnished Shepard with inflated figures representing the value of the cattle to be passed on to Ballard. If Shepard knew the figures were related to his transaction with Vickers and were false, there are also questions of fact as to whether Shepard intended that Vickers rely on the false appraisals and whether Vickers did in fact rely on the appraisals in purchasing Shepard’s cattle.
As we stated in Richards v. Wax, 511 So.2d 433 (Fla. 2d DCA 1987):
“[FJraud is not ordinarily a suitable subject for summary judgment.” Levey v. Getelman, 408 So.2d 663, 665 (Fla. 3d DCA 1981). “[I]t is a subtle thing requiring a full explanation of the facts and circumstances of the alleged wrong to determine if they collectively constitute a fraud.” Amazon v. Davidson, 390 So.2d 383, 385 (Fla. 5th DCA 1980).
511 So.2d at 434.
A genuine issue of material fact exists as to Vickers’ allegations of fraudulent conduct on the part of Shepard, thereby precluding summary judgment.
We reverse the trial court’s entry of summary judgment and remand with instructions that the case proceed to trial.
CAMPBELL, A.C.J., and PARKER, J., concur.